IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 22, 2016 Session

**STATE OF TENNESSEE v. DEWEY BURTON, JR.**

**Appeal from the Criminal Court for Knox County**
**No. 103245      G. Scott Green, Judge**

_____

**No. E2015-00879-CCA-R3-CD – Filed June 9, 2016**

_____

Defendant, Dewey Burton, Jr., appeals his conviction for aggravated child neglect, raising the following issues: (1) whether the child neglect statute is unconstitutionally vague; (2) whether the jury instructions inadequately explained the mens rea requirement; (3) whether the trial court erred by permitting the medical expert to offer an opinion as to an ultimate issue; and (4) whether the evidence was sufficient to support his conviction. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Mark E. Stephens, District Public Defender, and John Halstead, Assistant Public Defender, for the appellant, Dewey Burton, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Charme P. Allen, District Attorney General; Ashley McDermott, Christopher Rodgers, and Kevin Teeters, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Factual Summary*

This is Defendant's direct appeal from his conviction for aggravated child neglect, a class A felony. Following a jury trial, Defendant was sentenced to fifteen years of confinement as a standard offender. The following evidence was presented at trial.

On April 9, 2013, Defendant was home alone with his girlfriend's two children. L.B. was three years old, and P.B ("victim") was seventeen months old.[1] Defendant testified that he had been dating his girlfriend for over a year and described L.B. and P.B. as "great kids."

When Defendant moved into his house, he increased the temperature of the hot water heater "to save water" and so that he could use the water for sterilization purposes while he was remodeling. Defendant did not think the temperature of the hot water heater was dangerous because he had never been burned by the water in his house.

On the day of the incident, Defendant's girlfriend left the house around 4:00 p.m. to meet Defendant's uncle. P.B. was asleep in his bedroom, and L.B. was playing in the backyard. P.B. awoke and went outside to play with L.B. Defendant could see the children from the living room inside, and he was "in and out with them." From inside, Defendant observed P.B. fall down and "bust" his nose and lip. There were pebbles on his hands and knees, and he was bleeding "a little." P.B. cried but stopped when Defendant picked him up. Defendant wiped some blood from P.B., who appeared to be "fine." Defendant removed P.B.'s clothes and diaper, placed him in the back of the bath tub, and "cut the tub on." Defendant explained, "I just grabbed it and pulled it out, you know, and I cut it toward the hot, but I don't think I cut it all the way on hot." P.B. was sitting up, and Defendant placed some toys in his lap. Defendant explained that it usually took a "few minutes" for the water to heat up "because the hot water heater is in the basement all the way up under the house . . . under the back bedroom, basically, and that's all the way at the other end of the house." The tub could not fill up with water because the drain stopper was not in the tub.

L.B. entered the bathroom, tugged on Defendant, and told him that she was hungry. Defendant could hear the microwave beeping where he was heating some food for L.B. Defendant left the bathroom and removed the food from the microwave. L.B. entered the kitchen and climbed into a chair. Defendant stirred the food and placed it in front of L.B. and then heard P.B. "scream." Defendant "took off" to the bathroom and saw "heat coming off the hot water." P.B. was "standing at the back of the tub holding onto the tub." Defendant immediately turned off the water and removed P.B. from the tub. P.B. was red. Defendant dried him off, put a diaper and shorts on him, and sat him on the couch. Defendant then gave P.B. some milk, and he appeared to be "fine," although he moaned "a little bit . . . off and on." L.B. finished eating and then joined Defendant and P.B. on the couch to watch television.

---

[1] It is the policy of this Court to refer to minors by their initials.

Defendant's girlfriend did not have a phone, but he tried calling his uncle to inform her of what happened. Defendant could not reach her because she was not with his uncle. Because his uncle's wife was a nurse, Defendant told him to tell her what was going on, and she informed Defendant to continue observing P.B.'s condition. She said that if P.B. was only red, then he "should be okay." Defendant did not give P.B. any kind of pain-reducing medication.

An hour and a half or two hours after the incident, P.B. walked into his bedroom and got into his bed "like he normally did." He was "still just a little red," but the discoloration "was kind of going away." When Defendant's girlfriend returned home, he told her what happened. Defendant's girlfriend looked at P.B. but did not wake him up. Defendant went to bed before his girlfriend. When she got into bed with him, she mentioned that P.B. "looks bad," but "she didn't really say nothing else about it." Defendant did not get the impression that he needed to go look at P.B. himself, and he continued to sleep.

The next morning, Defendant was the first person to wake up. He turned on the lights and the coffee maker and went into P.B.'s bedroom. P.B. "rolled over and looked at [Defendant], and his face . . . had blisters all across his lip and his head, and . . . he looked awful." Defendant woke his girlfriend and told her that they had to take P.B. to the hospital. P.B. did not cry until Defendant put him in his mother's lap, and P.B. "still didn't act like it hurt him." After taking him to the local hospital, P.B.'s mother accompanied him to Vanderbilt University Hospital, but Defendant remained in Knoxville, where he was interviewed at home by Investigator Jonathan Harris of the Knoxville Police Department.

Investigator Harris testified that he went to the hospital after being notified of the victim's injuries by the Tennessee Department of Children's Services ("DCS"). He viewed and photographed the victim's injuries. Then, Investigator Harris and a DCS representative interviewed Defendant.[2] Defendant led them through the house during the interview, which lasted between thirty and forty-five minutes. Defendant cooperated fully with the investigation.

Dr. Deborah Lowen was a pediatrician and head of the Center for Child Protection and Wellbeing at Vanderbilt Children's Hospital where the victim was treated for four days. The trial court certified Dr. Lowen as an expert in in child abuse and child neglect without objection. Dr. Lowen was asked to provide consultation about the nature of the victim's injuries. He had second degree burns on over seven percent of his body's surface area. The injuries to his upper body were worse than those to his lower body.

---

[2] Two audio recordings of statements made by Defendant were presented to the jury. The content of the recordings was largely consistent with Defendant's trial testimony.

There were burns on his face, chest and shoulders, back, right upper arm, genital area, and the right side of his hip and upper thigh. These injuries were consistent with exposure to hot bath water. The location of the injuries suggested that the victim was "sitting down, head down, right arm against his side, and right knee bent" when he sustained the injuries.

Dr. Lowen explained that treatment for second degree burns begins with pain management because they are "very, very painful." The victim was given morphine and an anti-anxiety medication. After pain management, the dead skin is removed, the injuries are cleaned, and medicine is applied to the affected areas to prevent infection.

According to Dr. Lowen, a seventeen-month-old would have cried when the burns were inflicted and would have experienced "a lot of pain." Initially, the skin may have "looked just very red," but the nature of the burns in this case indicate that the burned skin would have "very quickly" formed blisters, and the skin may have been "already coming off." Dr. Lowen testified that the victim's wounds would have been obvious and in apparent need of medical attention to an ordinary person. She also testified that a seventeen-month-old would not be expected to sleep through the night with these injuries without the aid of pain medication.

The victim's grandmother visited P.B. at East Tennessee Children's Hospital and accompanied him by ambulance to Vanderbilt University Hospital. She was educated by the medical staff on how to continue cleaning and dressing P.B.'s wounds once he was released. The grandmother gave P.B. pain and anti-anxiety medication about half an hour before she treated the victim's wounds, and the victim still cried even with the medication. As the wounds healed, P.B. had some scarring on his back, but no scarring is visible if he is clothed.

When asked how he felt about what happened to P.B., Defendant testified:

It breaks my heart. I mean, you know, I raised him since he was three [months old], so, you know, it's kind of—it just—it really—it's bad. It was my fault too. I stuck him in there.

During cross-examination, Defendant acknowledged that there were "all kinds of different things" that he wished he had done instead of what happened. He agreed that leaving P.B. in the bathtub was "neglect" and that he "shouldn't have" done it.

*Analysis*

Defendant raises the following issues on appeal: (1) whether Tennessee Code Annotated section 39-15-402 is unconstitutionally vague because it does not define

"neglect"; (2) whether the jury instructions inadequately defined the mens rea element of aggravated child neglect; (3) whether the trial court erred by allowing the medical expert to give an opinion as to whether Defendant was neglectful; and (4) whether the evidence was sufficient to support the conviction.

## A. Vagueness

Defendant argues that Tennessee Code Annotated section 39-15-402, which creates the criminal offense of aggravated child neglect, is unconstitutionally vague because it does not provide a definition of "neglect" to identify what type of conduct constitutes criminal child neglect. The State posits that Defendant has waived this argument because he failed to give notice to the Attorney General that he was challenging the validity of the statute, as required by Tennessee Code Annotated section 29-14-107(b). Alternatively, the State maintains that the statute at issue provides adequate notice as to what conduct is prohibited such that it is not impermissibly vague.

Tennessee Code Annotated section 29-14-107(b) provides that "if the statute . . . is of statewide effect and is alleged to be unconstitutional, the attorney general and reporter shall also be served with a copy of the proceeding and be entitled to be heard." This Court has previously explained that Section 29-14-107(b) "requires notice to the attorney general when the constitutional validity of a general state law is challenged in a declaratory judgment action" and is inapplicable in criminal cases. *State v. Devon Wiggins*, No. W2007-01734-CCA-R3-CD, 2009 WL 1362323, at *7 (Tenn. Crim. App. May 15, 2009), *perm. app. denied* (Tenn. Dec. 21, 2009). *But see State v. Dwight James*, No. M2013-02030-CCA-R3-CD, 2014 WL 3510294, at *2 (Tenn. Crim. App. July 15, 2014) (holding that the defendant waived his constitutional challenge to a sex offender registration statute by failing to comply with Section 29-14-107(b)), *perm. app. denied* (Tenn. Oct. 29, 2014). In this case, we conclude that Defendant was not required to give notice to the Attorney General of his constitutional challenge and has not waived this issue.

A "vague statute is vulnerable to a constitutional challenge because it (1) fails to provide fair notice that certain activities are unlawful; and (2) fails to establish reasonably clear guidelines for law enforcement officials and courts, which, in turn, invites arbitrary and discriminatory enforcement." *State v. Pickett*, 211 S.W.3d 696 702 (Tenn. 2007). "Due process requires that a statute provide 'fair warning' and prohibits holding an individual criminally liable for conduct that a person of common intelligence would not have understood to be proscribed." *State v. Burkhart*, 58 S.W.3d 694, 697 (Tenn. 2001) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). To avoid constitutional infirmity, a criminal statute must be "sufficiently precise to put an individual on notice of prohibited activities." *Id.* (quoting *State v. Wilkins*, 655 S.W.2d 914, 915 (Tenn. 1983)). When evaluating a statute for vagueness, we "may consider the plain meaning of the

statutory terms, the legislative history, and prior judicial interpretations of the statutory language." *State v. Crank*, 468 S.W.3d 15, 23 (Tenn. 2015).

Tennessee Code Annotated section 39-15-402(a) provides that a person "commits the offense of . . . aggravated child neglect . . . who commits . . . child neglect, as defined in [Tennessee Code Annotated section] 39-15-401(b) . . . and . . . [t]he act of . . . neglect . . . results in serious bodily injury to the child[.]" Section 39-15-401(b) makes it a crime to "knowingly . . . neglect[] a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare[.]"

Our criminal statutory scheme does not provide a definition of neglect. *State v. Sherman*, 266 S.W.3d 395, 405 (Tenn. 2008). However, in *State v. Tyaneshia Turner*, No. W1999-00530-CCA-R3-CD (Tenn. Crim. App. June 21, 2000), *perm. app. denied* (Tenn. Jan. 2, 2001), this Court concluded that the statute was not vague despite the lack of definition for neglect. We explained:

> The "common understanding" of "neglect" is "to ignore or disregard" or "to fail to care for or attend to sufficiently or properly." *See, e.g.*, *Webster's New World Dictionary* 907 (3d coll. ed. 1988). Further, the plain language of the statute prohibits "knowingly, other than by accidental means, . . . neglect[ing] . . . a child so as to adversely affect the child's health and welfare." Tenn. Code Ann. § 39-15-401(a) (1997). This Court has previously held that "[t]he neglect of 'a child so as to adversely affect its health and welfare' presents a plain and certain meaning. The warning of the prohibited conduct is, in our view, sufficiently clear." *State v. Cynthia Denise Smith*, No. 1153, 1990 WL 134934, at *3 (Tenn. Crim. App., Knoxville, Sept. 20, 1990).

*Id.*, slip op. at 9; *accord State v. Kathryn Lee Adler*, No. W2001-00951-CCA-R3-CD, 2002 WL 1482704, at *6 (Tenn. Crim. App. Feb. 19, 2002) (rejecting vagueness challenge to term "neglect" by relying on *Tyaneshia Turner*), *perm. app. denied* (Tenn. Sept. 9, 2002). Given the plain meaning and the previous judicial interpretations of the word neglect, we agree that the statute is sufficiently clear to put an ordinary person of common intelligence on notice that it is a crime to knowingly fail to provide reasonable attention or supervision to a child where such an omission results in an adverse effect to the health and welfare of the child.[3] Indeed, Defendant acknowledged at trial that he

---

[3] Defendant's argument regarding vagueness is also premised upon the assertion that there is some spectrum of neglectful conduct that cannot be criminally punished because such conduct is not sufficiently culpable. Defendant characterizes this type of conduct as ordinary neglect or civil negligence. Defendant argues that the statute is vague because it does not define neglect in such a way that precludes criminal punishment for acts of ordinary neglect. However, Defendant's argument rests on a false dichotomy. As discussed more fully in the following section of this opinion, the statute can and does

considered his conduct to be neglect within his understanding of the word. Defendant is not entitled to relief on this basis.

## B. Jury Instructions

Defendant argues that the jury instructions were inadequate because they did not clearly articulate the difference between the mens rea required for criminal neglect and civil neglect. The State contends that the jury instructions were proper. We agree with the State.

A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *see State v. Leath*, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court must "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). A jury instruction is considered "prejudicially erroneous" only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

The trial court gave the following jury instruction on the offense:

> Any person who commits the offense of aggravated child neglect is guilty of a crime.
>
> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

---

prohibit all knowing neglect of a child. Because there is no authority prohibiting the scope of the statute from reaching all neglectful conduct, ordinary or otherwise, the statute does not have to contain a definition of neglect that delineates criminal neglect and ordinary neglect.

We take this opportunity to point out that there is a difference between one's conduct that constitutes neglect and one's mental state that constitutes negligence. This is the fundamental difference between actus reus and mens rea. 21 Am. Jur. 2d Criminal Law § 112. Regarding the latter, there is a distinction of legal significance between ordinary negligence and criminal negligence. Where the law requires criminal conduct be accompanied with a state of mind of criminal negligence, there is no crime if the criminal conduct is only accompanied by a state of mind of ordinary negligence. However, there is no such distinction for conduct that constitutes neglect. One's conduct either is neglect or it is not, although the neglectful conduct also will be accompanied by some type of mens rea.

(1)     that the defendant knowingly neglected a child so as to adversely affect the child's health and welfare; and

(2)     that the act of neglect resulted in serious bodily injury to the child; and

(3)     that the child was eight (8) years of age or less.

In a separate "definitions" section, the jury instructions explained:

To constitute "neglect," the state must prove beyond a reasonable doubt that there was an actual adverse effect to the child's health and welfare.  A mere risk of harm is not sufficient.  Neglect is a continuing course of conduct beginning with the first act or omission that causes adverse effects to a child's health and welfare, and can be an act of commission or omission.  Neglect means a failure to provide medical care, proper supervision, or food or other basic necessities which creates a substantial or unjustifiable risk of harm.

"Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist.  A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

These jury instructions are largely from section 21.01(b) of the Tennessee Pattern Jury Instructions.  Before the trial, Defendant proposed the following supplemental jury instruction on neglect:

Neglect means a persistent failure to provide medical care, proper supervision, or food or other basic necessities which creates a substantial or unjustifiable risk of harm.  The risk must be of such a nature and degree that the disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

The first sentence borrows definitions from other sections of the Tennessee Code Annotated, and the remainder of the proposed instruction uses statutory language from the standard for the mens rea of recklessness and criminal negligence, *see* T.C.A. § 39-11-302.  The trial court included the first sentence without the word "persistent."  The trial court rejected the second sentence.  Defendant maintains that the omission of that language is problematic.

However, Defendant's argument is misguided. Our supreme court has previously determined that child neglect is a "nature of conduct" offense with two prongs, one for neglect and one for injury. *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000) ("Child neglect requires that: (1) a person knowingly neglect a child . . . ; and (2) the child's health and welfare are adversely affected."). The "knowingly" mens rea requirement only applies to the neglect prong, not the injury prong. *Id.* at 897. Thus, while a defendant must knowingly engage in conduct constituting neglect, the defendant is not required to have any awareness of the likelihood that injury could result from the neglect. If the defendant's conduct was knowing and an adverse effect to the child followed, then the criminal offense was committed. *Id.*

Defendant's argument, if accepted, would change the elements of the offense by imposing a scienter requirement to the results of the conduct, requiring that a defendant have some degree of awareness and disregard of the risks associated with his conduct. That simply is not what the statute requires. Defendant relies on various cases explicating the mens rea requirement for criminally negligent homicide. However, those cases are inapposite because that offense imposes a mens rea requirement as to the results of the defendant's conduct. *See State v. Page*, 81 S.W.3d 781, 788 (Tenn. Crim. App. 2002) ("In addition to knowing second degree murder, we also believe that voluntary manslaughter, reckless homicide and criminally negligent homicide are result-of-conduct offenses."). The knowing requirement for child neglect entails a greater culpability than criminal negligence. For this offense, a defendant's neglect must be knowing, rather than criminally negligent. *See Ducker*, 27 S.W.3d at 897 (distinguishing between the knowing and unknowing neglect of leaving a child alone in a locked vehicle).[4] As explained above, a defendant is not required to have any appreciation of the risks associated with his conduct. Child neglect is not a "result-of-conduct" offense. It is a "nature of conduct" offense. *Id.* Because the jury instructions were a complete and correct statement of the law, Defendant is not entitled to relief on this issue.

## C. Expert Opinion

Defendant argues that the trial court erred by permitting the medical expert to offer her opinion that Defendant's conduct constituted neglect because that was a legal conclusion for the jury. The State argues that this testimony was proper.

---

[4] In his appellate briefs, Defendant also maintains that the removal of the phrase "other than by accidental means" from the child neglect statute has unacceptably broadened the scope of the statute to permit conviction for acts of ordinary negligence. Whatever the reason for that amendment of the statute, it does not change the fact that the statute still does not permit conviction for anything less than knowing neglect of a child.

The trial court certified Dr. Lowe as a medical expert in child abuse and child neglect without objection from Defendant. However, the trial court overruled Defendant's objection to the following testimony from Dr. Lowen:

Prosecutor: And when you viewed the burns, and based on the history that you received, or based on the history that I'm telling you that it was caused by a shower head and hot water, is that -- as an expert in child abuse and child neglect can you offer an opinion with regards to whether or not that would tend to indicate neglect?

Defense counsel: [Objection.]

Trial court: [Overruled.]

Witness: It's a little bit difficult question to answer because children do get burned accidentally, and sometimes that's due to supervisory neglect, sometimes it's due to other neglect, so it depends on the history of how it happened to determine whether there was neglect involved.

Prosecutor: Let me ask you a specific question. Leaving a seventeen-month-old in the bathtub with the hot water turned on, would you consider that neglect as a neglect expert?

Witness: Very much so. Can I clarify?

Prosecutor: Sure.

Witness: I consider leaving a seventeen-month-old in a bathtub unattended with whatever—with cold water, warm water, hot water, anything—neglectful.

Prosecutor: After [P.B.] received those burns would it have been obvious that he received burns?

Witness: Yes.

Prosecutor: Okay. Would you consider [it] neglect to not take the child to the hospital?

Witness: Yes.

. . . .

Prosecutor: And just again, based on the history that I've kind of provided you here, based on the defendant's statement and the injuries that you saw with the child, if the statement is that the child was left, a seventeen-month-old was left, in the bathtub with hot water running, would you—can you state to a reasonable degree of medical certainty that that would be neglect of that child?

Witness: Definitely.

During cross-examination, Dr. Lowen further testified:

Defense counsel: [A]nd when you said left in a tub with the water running, I guess, does it matter if the stopper is out of the tub? I mean, that's at least one factor, right?

Witness: A seventeen-month-old should never ever . . . be left in the tub with water . . . whether the stopper's in or not.

Defense counsel: Okay.

Shortly thereafter, during redirect examination, Dr. Lowen provided the following testimony:

Prosecutor: We've talked about the burns, and then we've talked about that it would be neglect to leave the child in the tub, would it be particularly neglectful if the tub were raised? . . . [I]f there were two or three steps leading up to a tub, does that change anything about your opinion?

Witness: You know, it's just very—it's just neglect regardless. Seventeen-month-olds, a lot of them can climb into a bathtub, some cannot. Assuming he was the type that could and I—let me see if I got that history whether he could—I did not find out whether he could or could not climb in or out of a bathtub. But to expect a seventeen-month-old to be able to climb out of a bathtub, whether it's raised or not is—it's an erroneous assumption and dangerous.

-11-

Rule 702 of the Tennessee Rules of Evidence addresses the admissibility of opinion testimony of expert witnesses:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" *State v. Murphy*, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting *State v. Bolin*, 922 S.W.2d 870, 874 (Tenn. 1996)). "Testimony in the form of an opinion . . . otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Tenn. R. Evid. 704.

Additionally, an expert witness's testimony must be relevant to the issues at trial. Tenn. R. Evid. 402. Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Where the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice, waste of time, or needless presentation of cumulative evidence, it may be inadmissible. Tenn. R. Evid. 403.

Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court. *See McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263-64 (Tenn. 1997); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). On appellate review, the trial court's ruling shall not be overturned absent a finding that the trial court abused its discretion in admitting or excluding the expert testimony. *Ballard*, 855 S.W.2d at 562. "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

Defendant relies on *State v. Turner*, 30 S.W.3d 355 (Tenn. Crim. App. 2000), as support for the proposition that Dr. Lowen's testimony was improper. In that case, this Court held that it was improper for medical experts to be permitted to testify about "whether it would be child abuse for an adult male to hold a young child's arm against a kerosene heater, causing second degree burns." *Id.* at 360. We noted Rule 704, but we also recognized that "opinion testimony is not admissible on an ultimate issue if the jury

could readily draw its own conclusions on the matter without the aid of the witness'[s] opinion." *Id.* (citing *Tennessee Law of Evidence*, § 704.2 (3d ed. 1995); *Blackburn v. Murphy*, 737 S.W.2d 529, 533 (Tenn. 1987)). Ultimately, we concluded that the jury "did not need the doctors' opinions in this regard to determine whether the defendant committed the crimes with which he was charged, nor did the testimony substantially assist the jury in any way." *Id.* We also reasoned that "to the extent that the doctors' opinions ostensibly related to a 'medical' as opposed to a 'legal' definition of child abuse, the opinions were irrelevant to the case and potentially confusing to the jury." *Id.* The State distinguishes *Turner* from this case, arguing that the factual circumstances here are more "nuanced" and that the jury could not have readily drawn its own conclusion on the question of child neglect without the testimony of the expert witness.

We agree with Defendant that Dr. Lowen's testimony as to the ultimate issue was improper because the jury could have readily drawn its own conclusion about whether Defendant's conduct constituted neglect without the expert opinion. Thus, this evidence was not the kind that would have substantially assisted the jury. More troubling, however, is the risk of jury confusion and the temptation for the jury to disproportionately rely on the expert opinion. Just as we were skeptical in *Turner*, we are likewise skeptical here about whether Dr. Lowen's testimony was within the scope of her expertise. Although she testified that she could "state to a reasonable degree of medical certainty" that Defendant's conduct constituted child neglect, she did not explain how her opinion was based on her medical expertise, and it is not obvious to us. Although the vast majority of Dr. Lowen's testimony was relevant and helpful, her testimony in this regard was nothing more than her personal opinion about what is and is not neglectful parental conduct. As such, the admission of this evidence created a risk that the jury could have placed inordinate weight on her testimony about the ultimate issue due to the fact that she is well-qualified medical expert, rather than relied on its own judgment to determine whether, in its view, Defendant's conduct constituted child neglect. Under these circumstances, the trial court erred by admitting this expert testimony.

However, as we determined in *Turner*, the error was harmless because we cannot say that the admission of this testimony more probably than not affected the judgment. *Id.* at 360-61. There was little or no dispute about the facts. Although Defendant's theory of the case was that it was an accident, the evidence was clear that his conduct was done knowingly, and Defendant even admitted that he considered his conduct to be neglect. The jury was given clear and thorough instructions on the elements of the crime. Based on the totality of the circumstances of this case, we cannot conclude that Dr. Lowen's opinion testimony more likely than not affected "the jury's decision making." *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008). Defendant is not entitled to relief on this basis.

D. Sufficiency of the Evidence

-13-

Defendant argues that the evidence is insufficient to support his conviction for aggravated child neglect because his actions did not amount to neglect of the victim. To some extent, this is a repackaging of Defendant's first two issues because the overall complaint throughout his appeal is that his conduct was not culpable enough to constitute a criminal offense.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). This standard of review applies whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

As discussed above, the State was required to prove beyond a reasonable doubt that Defendant knowingly neglected the victim, resulting in serious bodily injury. *See* T.C.A. §§ 39-15-401(b), -402(a). Defendant does not dispute that the victim's second degree burns constituted serious bodily injury. *See* T.C.A. § 39-15-402(d). There is little or no dispute about the facts. Defendant placed the unclothed seventeen-month-old victim in the back of the bathtub and left the bathroom while the hot water was running. In Defendant's absence, the victim sustained second degree burns on over seven percent of his body, and Defendant did not take the victim to the hospital until the following morning. The victim spent four days in the hospital being treated for his burns, and he still displays some physical scarring. Although the stopper was not in the tub and Defendant was not far from the bathroom, it is clear that Defendant knowingly left the

-14-

victim unattended under circumstances that resulted in serious bodily injury.  As discussed above, the State was not required to prove that Defendant knew or should have known of the risk of harm posed by his conduct to any degree.  He is not entitled to relief on this basis.

*Conclusion*

Based on the foregoing, the judgments of the trial court are affirmed.


_____
TIMOTHY L. EASTER, JUDGE